UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

DONOR NETWORK WEST,

Plaintiff,

v.

ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services;

STEPHANIE CARLTON, in her official capacity as Acting Administrator of the Centers for Medicare & Medicaid Services;

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, CENTERS FOR MEDICARE & MEDICAID SERVICES,

Defendants.

RENOWN HEALTH,

Intervenor.

Case No. 3:25-cv-00140-ART-CSD

ORDER

Plaintiff Donor Network West ("DNWest"), an Organ Procurement Organization ("OPO"), sued federal Defendants, including the Centers for Medicare & Medicaid Services ("CMS"), a federal agency, asking this Court to vacate CMS's decision to grant Intervenor Renown Health's ("Renown") application to switch OPOs. (ECF No. 1.) The Court then denied DNWest's motion for a preliminary injunction, finding that the public's interest in not risking the loss of donated organs in Intervenor Renown's organ-donation program strongly outweighed DNWest's risk of irreparable reputational and economic harm and any serious questions on the merits. (ECF No. 52.)

Before the Court now is DNWest's motion for summary judgment (ECF No. 57), and CMS and Renown's cross-motions for summary judgment. (ECF Nos. 60; 63.) For the reasons stated below, the Court denies DNWest's motion for

1

summary judgment, and grants CMS and Renown's cross-motions for summary judgment.

## I.    BACKGROUND

The National Organ Transplant Act ("Transplant Act") is a broad federal policy that addresses the backlog of people in need of organ transplants by encouraging organ donation and distributing donated organs equitably and effectively. The Act carries out these goals by authorizing federal agencies "to provide grants and other payments to a national network of non-profit organizations tasked with acquiring, preserving, and transporting donated organs." *Adventist Health Sys./SunBelt, Inc. v. DHHS*, 17 F.4th 793, 796 (8th Cir. 2021). "This is an incredibly complex effort." *Id.*

### A.    Parties

Defendant Health & Human Services is a federal agency that contains the Centers for Medicare & Medicaid Services ("CMS"), one of the federal agencies that oversees organ donation and transplant programs. (ECF No. 1.) CMS granted the waiver at issue in this case. (ECF No. 68-1 at 5–7.) Defendants Robert F. Kennedy, Jr., and Stephanie Carlton are administrators for the Medicare program, and are sued in their official capacities for CMS's grant of the waiver.

Plaintiff Donor Network West ("DNWest") is an Organ Procurement Organization ("OPO") that operates in California and Nevada. DNWest is the third largest OPO in the country and has operated as Renown's OPO for almost forty years. (ECF No. 68-1 at 38–39.) DNWest has performed well at Renown for the last several years and received accolades for increasing the number of organ donations in Renown's hospital system. (*See* ECF No. 57.) In 2023, DNWest received an interim tier 2 performance rating from CMS. (ECF No. 68-1 at 6.)

Intervenor Renown Health ("Renown") is a healthcare organization with three hospitals in Reno, Nevada, at issue in this case. (ECF No. 68-1.) Renown applied for a waiver to switch OPOs in September 2023. (*Id.*)

2

Nonparty Nevada Donor Network ("NDN") is the OPO with which Renown applied to partner in place of DNWest. In 2023, NDN received a tier 1 performance evaluation from CMS. (ECF No. 68-1 at 6.)

**B.    How Organ Procurement Organizations Work**

OPOs are private, federally funded organizations that coordinate organ donations across the country. *See* 42 U.S.C. § 273; *Adventist Health*, 17 F.4th at 797. OPOs facilitate organ donation, while separate organizations carry out transplants. *Adventist Health*, 17 F.4th at 797.

**i.    OPOs and Donation Service Areas**

Congress saw the value of OPOs having durable relationships with the hospitals and other organizations and volunteers where they operate. *See, e.g.,* 42 U.S.C. § 1320b-8(a)(1)(B)(iv) (recognizing "length of continuity of a hospital's relationship" with an OPO); 42 U.S.C. § 273(b)(1)(H) (OPOs must have board members who represent hospitals and the public residing in their donation service area). To this end, OPOs are granted four-year monopolies for specified donation service areas. 42 CFR § 486.308. Donation service areas are "geographically irregular areas (within and among states)" that can be constructed around non-geographic factors like religion and cultural background. *See Callahan v. DHHS*, 939 F.3d 1251, 1255 (11th Cir. 2019). During an OPO's four-year term, it must serve "a substantial majority of the hospitals and other health care entities" within its donation service area that have facilities for donations. 42 U.S.C. § 273(b)(3). All donor hospitals must have affiliation agreements with the OPO assigned to their donation service area. 42 U.S.C. § 1320b-8(a)(1)(C).

Donor hospitals work exclusively with the OPO that covers their donation service area, and every hospital that conducts organ recovery or transplantation must have an affiliation with this "designated" OPO. 42 U.S.C. § 1320b-8(a)(1)(C). Renown's designated OPO is DNWest. (*See* ECF No. 68-1 at 273.)

Although hospitals must normally work with their designated OPO, a hospital can seek a waiver to work with a different OPO if CMS finds that it meets two statutory requirements. 42 U.S.C. § 1320b-8(a)(2)(A). CMS must determine that:

(i) the waiver is expected to increase organ donation; and
(ii) the waiver will assure equitable treatment of patients referred for transplants within the service area served by such hospital's designated organ procurement agency and within the service area served by the organ procurement agency with which the hospital seeks to enter into an agreement under the waiver.

*Id.* CMS also considers cost effectiveness, improvements in quality, and the length and continuity of a hospital's relationship with an OPO. *Id.* § 1320b-8(a)(2)(B). Neither the statute nor regulations specify how these factors are to be evaluated.

### ii.    The Tier System for Evaluating OPO Performance

The Transplant Act requires CMS to evaluate OPO performance every four years. 42 U.S.C. § 273(b)(1)(D)(ii)(I). If OPOs do not meet CMS's performance standards, they are decertified, and their service area becomes open for competitive bidding by other OPOs. *Id.*; *see* 42 C.F.R. § 486.316(b).

In 2020, CMS adopted a final rule for evaluating OPOs by comparing statistics among several metrics and separating them into three tiers based on performance compared to all other OPOs. 42 C.F.R. § 486.316. At the end of the four-year certification cycle, tier 1 OPOs retain their service areas, while tier 2 OPOs must compete for their service areas, and tier 3 OPOs are decertified. *Id.* The first recertification period to use the tier system will be in 2026, and it will only consider the tier rating from 2024. *See* 85 Fed. Reg. 77,898, 77,916. CMS shares "preliminary results [tier rating statistics] with each OPO to provide the opportunity to review the information and raise any concerns prior to the results being made publicly available and taking any enforcement action." *Id.* at 77,912. CMS extensively considered the metrics that go into tier ratings, including organ

4

donation rate, transplant rate, and donor potential adjusted for hospitals with waivers. *Id.* at 77, 921–22; *see also* 84 Fed. Reg. 76,228, 7630 *et seq.* (explanation of factors that go into tier rating).

### C.    Renown Seeks to End Contract with DNWest

Renown had to obtain a waiver from CMS to switch OPOs, as required by the statute. (ECF No. 68-1 at 9–14.) In 2023, Renown sent CMS a waiver request to switch OPOs from DNWest to NDN and alerted DNWest of its intent. (ECF No. 1-6.) DNWest alleges that Renown applied for a waiver to switch OPOs in exchange for NDN providing funding for a new transplant center at Renown, and that such an agreement may violate state and federal anti-kickback laws. (ECF No. 57 at 15–16.) Renown responds that the transplant center collaboration has nothing to do with the waiver request, and that had the waiver request been denied, NDN and DNWest's collaboration on the transplant center would have continued. (ECF No. 63 at 16; ECF No. 68-1 at 226.) Shortly after Renown applied for the waiver, DNWest issued public statements about the alleged kickback and sued Renown and NDN. (*See e.g.*, ECF No. 68-1 at 64.) That lawsuit is also before this Court. *See Donor Network W. v. Nev. Donor Network, Inc.*, No. 3:23-CV-00632-ART-CSD, 2025 WL 326980 (D. Nev. Jan. 29, 2025). DNWest voluntarily dismissed Renown in January 2024. (*See* ECF No. 68-1 at 64.)

### D.    CMS Grants Renown's Waiver Request

CMS opened public comment on Renown's request in November 2023. 88 Fed. Reg. 82,375; *id.* at 82,376, 82,381. It received 89 unique comments of 168 total. (ECF No. 68-1 at 5.) CMS approved the waiver in December 2024. (*Id.*) In its four-page waiver decision and eight-page internal analysis, CMS summarized comments and explained its rationale. (*Id.* at 5–8, 280–87.)

CMS cited two reasons for finding that the waiver would be likely to increase expected organ donation: NDN's higher interim tier rating and DNWest's deteriorating relationship with Renown. CMS considered that the tier system

includes organ donation rates, expected transplant rates, observed transplant rates, performance relative to other OPOs based on these rates, and previous assessments on these factors for the previous three years. (*Id.* at 282–83 (citing OPO Public Performance Report, 2023 Assessment).) CMS considered advantages to using the tier system including CMS's collection and analysis of data, which lets the agency avoid relying on an OPO or hospital's self-interested framing of data. (*See id.* at 283.)

CMS also concluded that Renown's "working relationship with DNWest has recently deteriorated." (*Id.* at 7.) CMS considered DNWest's lawsuit against Renown, DNWest's public statements accusing Renown of kickbacks with NDN, and Renown's other statements regarding its relationship with DNWest. (*See id.* at 286.) CMS's comments about DNWest's "public statements" refers to several letters submitted to the administrative record that mentioned DNWest's lawsuit and accused Renown of taking kickbacks. (*See id.* at 55–60, 101–28, 234–45.)

Regarding the second statutory factor, CMS also found that the waiver would "assure equitable treatment." (*Id.* at 282–84); 42 U.S.C. § 1320b-8(a)(2)(A)(ii). CMS found that racial minorities had comparable donation and service rates at both DNWest and NDN, and the increased organ donation expected from the waiver would assure equitable treatment for all those in need of a transplant. (*Id.*) CMS also explained that it did not believe "that granting the waiver will impact the regional distribution of organs in the service areas of either OPO" and "that the national organ allocation policies . . . will help ensure equitable treatment of patients referred for transplants in both service areas." (*Id.*)

**E.    The Court Denies DNWest's Motion for a Preliminary Injunction**

Following CMS's approval of its request, in December 2024, Renown alerted DNWest that the waiver would take effect on March 31, 2025. (ECF No. 68-1 at 320.) DNWest filed its lawsuit on March 7, 2025, and a motion for a preliminary

injunction on March 10, 2025. (ECF Nos. 1, 15.) Between notifying DNWest and learning of the lawsuit, Renown engaged in "significant planning, instruction, and communications with medical staff." (ECF No. 63-1 at 4.) Renown subsequently moved to intervene. (ECF No. 41.)

On March 31, 2025, the Court denied DNWest's motion for a preliminary injunction, finding that the public's interest in not risking the loss of donated organs in Renown's organ-donation program strongly outweighed DNWest's risk of irreparable reputational and economic harm and any serious questions on the merits. (ECF No. 52.)

Renown effectuated the transition on April 1, 2025, and reported that when comparing the annualized figures for 2025 to the statistics for 2024, there will likely be a 64% increase in donors, a 121% increase in transplants, and a 28% increase in tissue donation. (ECF No. 63-1 at 4.)

DNWest subsequently moved for summary judgment, arguing that CMS's decision to grant the waiver exceeded its statutory authority and was arbitrary and capricious. (ECF No. 57.) CMS and Renown, in response, cross-moved for summary judgment on DNWest's claims (ECF Nos. 60, 63), and DNWest replied. (ECF No. 67.) The parties then filed a Joint Appendix containing all pages of the administrative record that are cited or relied upon by the parties in their briefs. (ECF No. 68-1.)

## II.   STANDARD OF REVIEW

DNWest's claims arise under the Administrative Procedure Act, which allows a court to overturn agency action that is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, as well as agency action taken "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). The reviewing court must determine whether the agency's decision was based on a consideration of the relevant factors or whether there has been a clear error of judgment. *Motor Vehicle Manufacturers Ass'n of the*

*United States, Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983); *Hells Canyon Alliance v. U.S. Forest Serv.,* 227 F.3d 1170, 1177 (9th Cir. 2000). An action is arbitrary and capricious if it "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency . . . ." *Bark v. United States Forest Serv.,* 958 F.3d 865, 869 (9th Cir. 2020) (internal citation omitted).

In deciding whether to grant summary judgment on an APA challenge, the district court "is not required to resolve any facts." *Occidental Eng'g Co. v. I.N.S.,* 753 F.2d 766, 769 (9th Cir. 1985). Instead, the court determines "whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Id.*

## III. ANALYSIS

DNWest argues that CMS's decision was not in accordance with the authority granted CMS by 42 U.S.C. § 1320b-8(a)(2)(A), that CMS's decision did not comply with the requirements of reasoned decision-making, and that CMS failed to address significant comments, objections, and evidence. (ECF No. 57.) CMS and Renown contend that CMS's approval complied with the statute, that its decision was adequately explained and supported by substantial evidence, and that it properly responded to public comments. (ECF Nos. 60; 63.)

### A. Compliance with the Statute

DNWest argues that CMS exceeded its authority under 42 U.S.C. § 1320b-8(a)(2)(A) by using interim tier ratings for OPOs and DNWest's deteriorating relationship with Renown as bases for its findings. (ECF No. 57 at 24–27.) CMS and Renown argue that these were reasonable factors to consider in its findings granting the waiver application, and that CMS complied with the statute. (ECF Nos. 60 at 16–23; 63 at 13–18.)

Courts "exercise their independent judgment in deciding whether an

agency has acted within its statutory authority." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024). In statutory interpretation, analysis begins "with the plain language of the statute." *Cheneau v. Garland*, 997 F.3d 916, 919 (9th Cir. 2021) (citing *Jimenez v. Quarterman*, 555 U.S. 113, 118 (2009)). To find the plain language of the statute, courts read the words "in their context and with a view to their place in the overall statutory scheme." *King v. Burwell*, 576 U.S. 473, 486 (2015).

The relevant statute here is the Transplant Act, codified at 42 U.S.C. § 273 *et seq.* A separately codified provision at 42 U.S.C. § 1320b-8(a)(2)(A) requires CMS to grant a waiver to a hospital to switch OPOs if the agency determines:

> (i)    the waiver is expected to increase organ donation; and
>
> (ii)   the waiver will assure equitable treatment of patients referred for transplants within the service area served by such hospital's designated organ procurement agency and within the service area served by the organ procurement agency with which the hospital seeks to enter into an agreement under the waiver.

### 1.    Expected to Increase Organ Donation

CMS used two bases to determine that letting Renown switch from DNWest to NDN would increase organ donation: NDN's higher tier rating and the breakdown of DNWest's relationship with Renown. The statute permits both factors to be used to assess this requirement.

### a.  Tier-Rating System

DNWest argues that 42 U.S.C. § 1320b-8(a)(2)(A) does not permit CMS to consider interim tier-ratings when determining if a waiver is expected to increase organ donation. (ECF No. 57 at 23–27.) CMS and Renown contend that CMS may choose how it assesses this question. (ECF Nos. 60 at 21–22; 63 at 15.)

Neither the statute nor the regulations explicitly provide a methodology to use in deciding whether a waiver is expected to increase organ donation. *See* 42

U.S.C. § 1320b-8(a)(2)(A); 42 C.F.R. § 486.308(e). Read as a whole, the statutory scheme allows the tier system, and interim data, as an acceptable basis for predicting increased organ donation. *See King*, 576 U.S. at 486 (courts construe "statutes, not isolated provisions"). The statute gives CMS authority to develop criteria to gauge the performance of OPOs on "outcome and process performance measures . . . based on empirical evidence . . . of organ donor potential in other related factors in each service area . . . [and] use multiple outcome measures." 42 U.S.C. § 273(b)(1)(a)(D). Under this grant of authority, CMS developed the tier system, which considers multiple outcome measures of organ donor potential, transplant rates, and other factors. *See* 85 Fed. Reg. 77,898 (Dec. 2, 2020); 42 CFR § 486.316. It is not contrary to the statute to use the methodology Congress instructed the agency to develop for assessing OPO performance to assess OPO performance.

DNWest argues that using the interim tier system to evaluate a single hospital's request for a waiver is contrary to the statute because tiers were designed to compare OPOs across entire donation service areas. (ECF No. 57 at 24–27.) The plain reading of the waiver provision, in the context of the statute, does not require CMS to find that organ donation rates will increase at the hospital requesting a waiver. "When the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended." *Cheneau*, 997 F.3d at 920 (internal citation omitted). Other provisions in the Transplant Act require an agency to evaluate "the rate of organ donation" at particular hospitals. *See, e.g.*, 42 U.S.C. §§ 274(f)–2(a)(1), (e). The hospital waiver provision only requires the agency to determine if the waiver is expected to increase organ donation. *See* 42 U.S.C. § 1320b-8(a)(2)(A)(i). CMS did not need to use a hospital-specific methodology to evaluate this factor.

DNWest also argues that using the tiering system is a bad proxy because it is preliminary and prone to fluctuations. (ECF No. 57.) However, DNWest does

10

not contend that the data is unreliable or invalid, and a plain reading of the provision and the statute does not limit CMS to only considering the data used for recertification decisions. The tier ratings that CMS used measured organ donation rates, expected transplant rates, observed transplant rates, performance relative to other OPOs based on these rates, and prior assessments on these factors for the previous three years, which all bear on whether organ donation is expected to increase. (ECF No. 68-1 at 282 (citing OPO Public Performance Report, 2023 Assessment).) As a result, CMS did not exceed its statutory authority when it used the tiering system to predict whether granting the waiver would increase organ donation.

### b. Renown's Relationship with DNWest

DNWest next argues that CMS improperly relied on the deteriorating relationship with Renown and DNWest in determining if a waiver was expected to increase organ donation. (ECF No. 57 at 27–28.) CMS responds that the statute expressly allows CMS to consider this relationship. (ECF No. 60 at 23.)

The Transplant Act recognizes that relationships between hospitals and OPOs are relevant to increasing organ donation. The Court construes the statute as a whole and assumes that Congress intended different meanings for "certain language in one part of the statute and different language in another." *See King*, 576 U.S. at 486; *Cheneau*, 997 F.3d at 920. The Transplant Act requires OPOs to "have effective agreements" with hospitals in its service areas, while it only requires that OPOs "have arrangements" with entities like tissue banks. 42 U.S.C. §§ 273(b)(3)(B), (G), (I). The Act funds programs for increasing organ donation rates at particular hospitals that must be "carried out jointly," with joint "leadership responsibility and accountability" by the hospital and OPO. *Id.* §§ 274(f)–2(b), (c). Read together, these provisions show that relationships between OPOs and hospitals are important to the Act's aim of increasing organ donation. The importance of relationships between OPOs and hospitals is also underscored

11

by 42 U.S.C. § 1320b-8(a)(2)(A)–(B), which allows CMS to consider "the length and continuity of a hospital's relationship with an organ procurement agency other than the hospital's designated organ procurement agency."

CMS found that switching OPOs at Renown would lead to increased organ donation because Renown's "relationship with DNWest has become increasingly strained and potentially irreconcilable." (ECF No. 68-1 at 278–79.) Specifically, CMS considered DNWest's lawsuit against Renown, DNWest's public statements accusing Renown of kickbacks with NDN, and Renown's other statements regarding its relationship with DNWest. (*Id.* at 226, 278–79.) Because the statute recognizes the importance of relationships between OPOs and hospitals, CMS did not exceed its statutory authority when it considered Renown's deteroriating relationship with DNWest in granting the waiver.

### 2.   Assuring Equitable Treatment

Renown also met the second mandatory factor regarding equitable treatment, which provides:

> [T]he waiver will assure equitable treatment of patients referred for transplants within the service area served by such hospital's designated organ procurement agency and within the service area served by the organ procurement agency with which the hospital seeks to enter into an agreement under the waiver.

42 U.S.C. § 1320b-8(a)(2)(A)(ii).

CMS's rationale for this determination was based on racial equity, increased expected organ donations with NDN as Renown's OPO, and national policy for allocating transplants. (ECF No. 68-1 at 282–84.) CMS found that racial minorities had comparable donation and service rates at both OPOs, increased organ donation expected from the switch would assure equitable treatment, and that national organ allocation policies will ensure equitable treatment. (*Id.*) CMS also explained that it did not believe "that granting the waiver will impact the regional distribution of organs in the service areas of either OPO" and "that the national organ allocation policies . . . will help ensure equitable treatment of

patients referred for transplants in both service areas." (*Id.* at 7.)

While DNWest argues that CMS's findings were inadequate, they satisfied the statute. This provision requires equitable allocation of donated organs in the donation service areas of both the existing and replacing OPO. This provision passed into law when an OPO's donation service area could affect where a donated organ would be transplanted. Social Security Act Amendments of 1994, Pub. L. No. 103-432 § 155, 108 Stat 4398, 4438 (1994). Current allocation policies do not allow for donation service areas to be considered in organ allocation decisions. *See Adventist Health*, 17 F.4th at 799–800. Accordingly, CMS's findings that the waiver would not "impact regional distribution of organs" and that national allocation policies ensure equitable treatment satisfied the statute. (ECF No. 68-1 at 7.) The Court therefore concludes that CMS did not act in excess of its statutory authority when it granted Renown's waiver request.

**B.     Reasoned Determination Supported by Substantial Evidence in the Administrative Record**

**1.     Using Tier Rating to Evaluate Renown's Request was not Arbitrary and Capricious**

DNWest next argues that data considered in the tier system is an inadequate proxy for expected increased organ donation because it measures OPO performance across entire service areas over a four-year period and fluctuates between interim years. (ECF No. 57 at 24–27.) This is a challenge to a policy decision, not statutory interpretation. Under deferential arbitrary and capricious review, the Court may not substitute its "policy judgment for that of the agency." *China Unicom (Americas) Operations Ltd. v. FCC*, 124 F.4th 1128, 1151 (9th Cir. 2024) (citing *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). The Court must uphold the agency's conclusions so long as they are supported by "[m]ore than a scintilla" of evidence. *Nat. Res. Def. Council v. EPA*, 735 F.3d 873, 877 (9th Cir. 2013). "'[R]eview of an administrative agency's

decision begins and ends with the reasoning that the agency relied upon in making that decision.'" *Nat. Res. Def. Council v. EPA*, 735 F.3d 873, 877 (9th Cir. 2013) (quoting *Safe Air for Everyone v. EPA,* 488 F.3d 1088, 1091 (9th Cir. 2007)).

The tier ratings used by CMS to make their decision included relevant data to predicting increased organ donation, like organ donation rates, expected transplant rates, observed transplant rates, performance relative to other OPOs based on these rates, and previous assessments on these factors for the previous three years. (ECF No. 68-1 at 282 (citing OPO Public Performance Report, 2023 Assessment).) CMS also considered other reasonable advantages to the tier system. CMS collects and assembles the data used to evaluate tiers, which avoids the problem of relying on an OPO or hospital's self-interested framing of data, facts noted by CMS. (*See* ECF No. 68-1 at 283 (recognizing this fact from a comment by NDN).) Data from the tier system is made public, which allows OPOs and hospitals to compare relative performance, anticipate possible challenges based on tier performance, or notice and publicize problematic data-collection, data-assembly, or data-reporting practices. The tier system incorporates procedural protections to meet these goals as well. *See also* 85 Fed. Reg. 77,898, 77,912 ("CMS will share preliminary results with each OPO to provide the opportunity to review the information and raise any concerns prior to the results being made publicly available and taking any enforcement action"). Tier data is a reasonable proxy for assessing expected increases in organ donation.

DNWest argues that using tier rating is arbitrary and capricious because ratings fluctuate greatly between years. (ECF No. 57 at 25–26.) To support this view, DNWest points to data that would have been available to CMS at the time it made its waiver decision in 2024. (*See* ECF No. 45.) DNWest argues that its own analysis of "Provisional Data" from 2023, showing both NDN and DNWest as tier 2 OPOs, proves that tier ratings change too quickly to accurately gauge waiver requests. (*Id.*; ECF No. 45-1.) While noting that this data still shows NDN as

having a higher organ donation rate than DNWest, (ECF No. 45-1 at 2), the Court lacks a basis for accepting DNWest's assertion that this fluctuation is arbitrary and does not reflect change in performance between years. CMS's adoption of the final rule contemplated performance changes between interim ratings—that is why CMS provides them to OPOs. *See* 85 Fed. Reg. at 77,912. Additionally, the administrative record shows that NDN's donation and transplant rates also exceeded DNWest's in 2019, 2020, and 2021. (ECF No. 68-1 at 70, 339–40, 344–45, 349–50.)

DNWest also argues that using interim tier data to make ultimate determinations upsets reliance interests and represents an unexplained change in position. (ECF No. 57 at 25.) DNWest alleges that CMS indicated it would only use interim data for monitoring purposes. (*Id.* (citing 85 Fed. Reg. at 77,916).) But the regulation that DNWest relies on for that proposition does not discuss the OPO waiver process and there is no evidence that CMS ever made such a claim. Instead, language in the cited regulation indicates that CMS expects "OPOs to implement a comprehensive data-driven [] program to monitor and evaluate their performance." 85 Fed. Reg. at 77,916. Contrary to DNWest's argument, this language could not invite any reliance interests. *See Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.,* 604 U.S. 542, 585 (2025) ("[A] belief about how an agency is likely to exercise its enforcement discretion is not a 'serious reliance interes[t].'" (quoting *F.C.C. v. Fox Television Stations, Inc.,* 556 U.S. 502, 515 (2009)).

DNWest also contends that basing a waiver request solely on differences in tier rating, without considering factors specific to the applicant hospital and service area, undermines the statutory scheme. (ECF No. 57 at 26–27.) However, DNWest has failed to show that is the case here, because CMS also considered whether either OPO has geographically advantageous locations to serve Renown, cost effectiveness, and the breakdown of Renown and DNWest's relationship.

(ECF No. 68-1 at 6–7.)

The Court therefore concludes that CMS's consideration of tier rating was not arbitrary and capricious.

### 2. Using Renown's Relationship with DNWest to Evaluate Renown's Request was not Arbitrary and Capricious

DNWest challenges CMS's assessment of the evidence suggesting its relationship with Renown had deteriorated. As stated above, the Court must uphold the agency's conclusions so long as they are supported by "[m]ore than a scintilla" of evidence. *Nat. Res. Def. Council v. EPA*, 735 F.3d 873, 877 (9th Cir. 2013). DNWest argues that there is no evidence on the administrative record showing that litigation had negatively affected performance metrics at Renown. (ECF No. 57 at 27–28.) DNWest further argues that mere assertions that a working relationship has deteriorated would let a hospital manufacture a waiver for commercial reasons without regard to statutory requirements. (*Id.* at 28.) But here, DNWest's own actions contributed to the relationship's decline.

Sufficient evidence supported CMS's conclusion that DNWest's relationship with Renown deteriorated. CMS concluded that DNWest's "public statements," (*see* ECF No. 68-1 at 5–6), including several letters submitted to the administrative record showing that DNWest accused Renown of taking kickbacks, led to a breakdown in DNWest's and Renown's relationship. (*See* ECF No. 68-1 at 55–60, 101–28, 234–45.) From this evidence, CMS reasonably concluded that a deteriorating relationship between DNWest and Renown could negatively impact organ donation. CMS did not have to cite to adversely impacted performance metrics when making this predictive judgment. *See Lands Council v. McNair*, 537 F.3d 981, 986 (9th Cir. 2008) (en banc), *overruled in part on other grounds by Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008) (Courts must "conduct a particularly deferential review of an agency's predictive judgments about areas that are within the agency's field of discretion and expertise" (internal quotations

16

and citations omitted)). The agency thus reasonably concluded that deteriorating relations could negatively impact organ donation.

### 3.   Other Considerations

DNWest also argues that CMS did not adequately explain how allowing Renown to partner with an OPO with a lower donation rate in Nevada, a higher kidney discard rate, higher costs, no proven success record with Renown, and no geographic advantage would lead to increased organ donation and ensure equitable treatment. (ECF No. 57 at 23.) However, CMS must determine whether granting a waiver is expected to increase organ donation and assure equitable treatment. 42 U.S.C. § 1320b-8(a)(2)(A). The agency is not required to find that one OPO outperforms the other in every available metric.

Regarding DNWest's data showing higher performance in Nevada compared to NDN, the Court notes that "where analysis of the relevant documents requires a high level of technical expertise," courts "defer to the informed discretion of the responsible federal agencies." *Arizona ex rel. Darwin v. EPA,* 815 F.3d 519, 530 (9th Cir. 2016) (internal citations and quotations removed). DNWest's statistics showing higher costs and discard rates for some organs over others do not themselves compel the Court to find CMS's waiver decision arbitrary and capricious. CMS considered this argument, but ultimately exercised its judgment in determining that NDN's tier rating, which considers several factors, including organ donation, would lead to increased donation rates if the waiver was granted. (ECF No. 68-1 at 7.)

Similarly, CMS considered DNWest's claims that it outperforms NDN in kidney discard rates. As stated above, the waiver statute directs CMS to determine whether granting a waiver request will increase *organ* donation, not just kidney donation. CMS found that the evidence demonstrated that NDN had higher donation and transplant rates overall, and reasonably concluded that "donation rates are expected to increase in partnership with [NDN]." (*Id.* at 7.)

Additionally, CMS considered DNWest's allegations that it has lower kidney costs than NDN. However, in reviewing the evidence, CMS found that NDN has lower costs for heart, liver, and lung. (*Id.* at 284–85.) CMS thus reasonably used its expertise to conclude that a "potential increase [in kidney costs] would [not] outweigh other considerations" supporting waiver. (*Id.* at 7.) Moreover, though cost effectiveness is a factor identified in the statute, consideration of cost effectiveness is discretionary. 42 U.S.C. § 1320b-8(a)(2)(B)(ii).

CMS also considered the length of DNWest's relationship with Renown and its claimed "geographic advantage." However, a prior relationship is not a statutorily mandated factor for deciding whether to issue a waiver, therefore CMS was not required to weigh it as a factor in its final decision, even though CMS discussed it. (ECF No. 68-1 at 286–87.) And CMS also considered that DNWest and Renown's relationship had recently deteriorated, while Renown and NDN had a decades-long positive relationship. (*Id.*) Similarly, CMS considered that "both DNW and NDN claim to have headquarters or office locations that are geographically advantageous to Renown," and reasonably concluded from the evidence before it that neither OPO had a "clear advantage over the other in terms of geographical location that might translate into increased quality or cost effectiveness." (*Id.* at 6–7.)

Accordingly, CMS made a reasonable determination, based on substantial evidence, that granting Renown's waiver request would increase organ donation and assure equitable treatment.

### C.     Response to Significant Comments

DNWest argues that CMS failed to take into account significant comments that alleged a kickback scheme between Renown and NDN, financial impropriety at NDN, NDN's poor relationship with its transplant center in Las Vegas, and comments raising policy concerns about rival OPOs raiding high-performing hospitals. (ECF No. 57 at 28–33.)

"An agency must consider and respond to significant comments received during the period for public comment." *Perez v. Mortg. Bankers Ass'in*, 575 U.S. 92, 96 (2015); *PPL Wallingford Energy LLC v. FERC*, 419 F.3d 1194, 1198 (D.C. Cir. 2005). Courts may not second-guess an agency's "weighing of risks and benefits" or penalize it "for departing from the . . . inferences and assumptions" of others." *California by & through Becerra v. Azar*, 950 F.3d 1067, 1096 (9th Cir. 2020).

As an initial matter, DNWest argues that CMS did not adequately consider or respond to all comments in granting the waiver request. (ECF No. 57 at 33–34.) "However, an agency need only respond to 'significant' comments, i.e., those which raise relevant points and which, if adopted, would require a change in the agency's proposed rule." *Am. Min. Cong. v. U.S. E.P.A.*, 965 F.2d 759, 771 (9th Cir. 1992) (citing *Home Box Office v. FCC*, 567 F.2d 9, 35 & n. 58 (D.C. Cir. 1977), *cert. denied*, 434 U.S. 829 (1977)). "The failure to respond to comments is grounds for reversal only if it reveals that the agency's decision was not based on consideration of the relevant factors." *Id.* (citing *Thompson v. Clark,* 741 F.2d 401, 409 (D.C. Cir. 1984)). As stated above, CMS made a reasoned determination based on the relevant factors and found that granting the waiver request would increase organ donation and assure equitable treatment. CMS also responded to all significant comments. DNWest's contention that CMS did not adequately respond to comments is therefore misplaced.

CMS's internal analysis and decision granting the waiver considered the kickback allegations in determining that DNWest and Renown's relationship had deteriorated. CMS's internal analysis says that DNWest claimed that "Renown Health was offered money by the requested OPO to build a transplant center, and . . . the requested OPO appeared to predicate the gift on Renown Health's application for a waiver." (ECF No. 68-1 at 282, 286.) CMS's decision then states that "Donor Network West's lawsuit against Renown Health and related public

statements, which Renown Health contends mischaracterized its intent in seeking to change OPOs." (*Id.* at 6.) The agency's reference to the lawsuit refers to DNWest's lawsuit against Renown and NDN alleging a kickback scheme, as confirmed by comments mentioning the lawsuit. (*Id.* at 125–26, 142.) When read with the internal analysis and comments alleging the kickback, the decision's reference to "related public statements" includes DNWest's allegations of the alleged kickback scheme. (*Id.* at 6.) In its concluding paragraph of the "Increased Organ Donation" section, these facts led CMS to conclude that Renown's working relationship with DNWest had deteriorated. (*Id.* at 7.) CMS rejecting DNWest's concern does not make its decision arbitrary and capricious. *See Becerra*, 950 F.3d at 1096.

DNWest also argues that CMS was required to address arguments in the comments that allowing OPOs to bribe high-performing hospitals would undermine the OPO system. (ECF No. 57 at 31–32.) CMS responds that these comments did not relate to the statutory findings it was required to make, and "adverse incentives are a result of the governing statute, which Congress—not CMS—must address." (ECF No. 60 at 29–30.) Renown also points to regulatory history of the Transplant Act that suggests that CMS had already considered and rejected DNWest's policy concern regarding poaching high-performing hospitals through waivers. (*See* ECF No. 63 (citing 71 Fed. Reg. 30982, 30987 (2006).)

Finally, DNWest argues that CMS failed to consider comments pointing out NDN's allegedly wasteful spending of government funds and NDN's poor relationship with its transplant center in Las Vegas. (ECF No. 57 at 30–31.) The internal analysis explicitly mentions and considers these comments in the section labeled "cost effectiveness." (ECF No. 68-1 at 284.) The decision mentions that "organ acquisition costs may be higher if the waiver is granted" and that NDN "has higher organ acquisition costs for kidneys . . . we do not believe that any potential increase would outweigh the other considerations identified." (*Id.* at 6–

7.) Though brief, these findings demonstrate that CMS considered these comments, and the Court will not second-guess its weighing. *Becerra*, 950 F.3d at 1096.

Regarding comments concerning DNWest's prior success with Renown, higher performance statistics within Nevada than NDN, lower kidney discard rate, lower costs, and geographic advantage, the Court reiterates the arguments made above. *See supra* III.B.3.

Accordingly, the Court holds that the statute does not foreclose using CMS's tier rating and breakdown in a relationship to evaluate the hospital-waiver factors and finds that CMS's consideration of the evidence and comments before it was not arbitrary and capricious.

## IV.   CONCLUSION

IT IS THEREFORE ORDERED that DNWest's motion for summary judgment (ECF No. 57) is DENIED.

IT IS FURTHER ORDERED that CMS's cross-motion for summary judgment (ECF No. 60) is GRANTED.

IT IS FURTHER ORDERED that Renown's cross-motion for summary judgment (ECF No. 63) is GRANTED.

IT IS FURTHER ORDERED that the Clerk of the Court is kindly instructed to ENTER JUDGMENT accordingly in favor of Defendants and CLOSE this case.

DATED THIS 10th day of March 2026.

ANNE R. TRAUM
UNITED STATES DISTRICT JUDGE